The next case this morning is Petratus v. Genentech. Mr. McCrary. May it please the court, my name is Matt McCrary on behalf of the Relator. I'd like to reserve five minutes for rebuttal. Granted. The most important question facing the court in this case is whether fraud that induces a physician to seek reimbursement from the government for a course of treatment that the physician would not have otherwise prescribed is actionable under the False Claims Act. Can I ask a question right there? Absolutely. Is the heart of your complaint, the thrust of your complaint in any event, that had the information about the adverse reaction data that you now allege was suppressed, had that been available, had that been disclosed, in addition to the disclosures about the existence of the risks that are challenged that were made, had those been available, that the physicians would not have submitted the claims for reimbursement in the first place, at least not for the amounts they sought because they would have prescribed smaller dosages? That's absolutely correct. For the subset of patients of Avastin, the at-risk patients, people with cardiac arrhythmia, proteinuria, and that testimony is a testimony. And that's the thrust of the case. That's the thrust of the case, correct. Go ahead. Or perhaps no dose at all. Or perhaps no dose at all, correct. The physician, based on his or her analysis of the patient and understanding of the patient's condition and their risk factors and the severity of Avastin's risk in that at-risk sub-patient population, that the physician would prescribe either a lower dose or no dose at all for that category of patients. And is it also accurate that even at the doses that were prescribed, they were not only for on-label uses but the dosages were within the limits of the labeled uses? That's correct. The label, even to this day, does not have any dose definities. So you're telling me this was ever off-label? Say that again. No part of what was sought for reimbursement was ever off-label? No, off-label uses were sought for reimbursement. What were off-label? Off-label uses, for example, currently the metastatic breast cancer indications were off-label. That's correct. I'm talking about what's part of this record. Were there allegations of off-label patients or dosages? Yes. What are the off-label uses, for example, macular degeneration? Because of the dose? Okay, I'm sorry. The at-risk data that was allegedly suppressed, the adverse reaction information, was that allegedly led to higher dosages than would otherwise have been prescribed or in some even smaller subset to prescriptions for patients who are at such a high degree of risk they wouldn't have been prescribed the drug at all, even though they have the indicated cancer condition. For the dosages that were prescribed, were they all within the limits of the label? Yes, the dosages as prescribed were within the limits of the label, either or within the limits that the compendia would recommend for off-label uses. And you're not alleging that those should have been changed? Well, we do allege that the label would have been changed, that it would have included contraindications and dose dependency, at least for proteinuria, because that's what the relator himself, when he analyzed the databases, that he said were more appropriate and contained a greater depth in the severity. Would the compendia have been changed? We don't specifically allege, there are no allegations that the compendia actually would have changed, but the compendia are influenced by key opinion leaders such as Dr. Lafayette, who was shut down when he asked about, in particular, dose dependencies for proteinuria. And the compendia is also influenced by the medical community in general that we allege was misled by Genentech's actions. But I want to make clear that fraud on the compendia and fraud on the FDA is not the basis of the relator's claims in this case. This is a case about fraud on the physicians, and regardless of what the FDA would have done and regardless of what the compendia would have said, if this information had been disclosed, would the physicians... Well, wait a minute. I thought your argument is that had this information been disclosed, the label, instead of saying that the incidence of proteinuria is less than 1%, it might have said it's less than 5% or less than 3%. Well, we do say that the label should have been changed, but the key... So why do you say fraud on the FDA? Well, to state a claim for fraud on the FDA, you have to allege that the FDA would have acted differently or removed indications, et cetera. So you're conceding it would not have acted differently had it... I'm not conceding that. I'm saying that the complaint does not allege that. Right. That's what I thought. Correct. The complaint does not allege either a fraud on the FDA theory or a fraud on the compendia theory. Our theory is that Genentech, through its intentional suppression of the risks of Avastin for these at-risk patients, materially changed physicians' prescribing behavior and that the physicians would not have submitted claims for payment to the government for Avastin, for these at-risk patients, either at the high doses that they did submit or any dose at all. So that's the key here. It's not about fraud on the FDA. But couldn't you say that about any data point in medicine? That, you know, there is some physician out there, if he or she had known X data point that a company did not disclose to the FDA, that data point might have caused that one doctor to prescribe a different dosage or no dosage at all for that drug, despite the fact that it's medically indicated. You're talking about an isolated incident with a physician. What we're talking about is pervasive, and we say that we allege that the standard of care for reasonable physicians would have changed in light of this information that was disclosed. Generally? Not just one physician? Correct. The standard of care would have changed. Correct. But isn't that a regulatory matter for the FDA to handle? When the FDA tells doctors which drugs are indicated, which drugs aren't, then the compendia tells them, you know, accepted off-label usages, that's all a matter for administrative state regulation, not case-by-case adjudication. Our theory is as such, that the FDA, CMS, they set high-level reimbursement policy decisions. These types of treatments are generally indicated for these types of diseases. Here's the amount of treatment that's generally appropriate. But the statutory scheme, both Congress and CMS, through their regulations, have highlighted the key role that the physician plays as a gatekeeper to medical necessity determination. All right, but even if we agree with you that, and as the government we'll hear from seems to state in its briefing, even if we agree with you that the district court wrongly conflated the two, how would it have made a difference here? Where's the materiality? The materiality, I would submit that CMS is not going to pay for any treatment unless there's a physician prescription that certifies medical necessity. But we know CMS is going to pay for Avastin for cancer patients who have colon cancer or rectal cancer. But only if the physician prescribes it. For example, if I have cancer and I go to CMS and say, look, I have cancer, please give me Avastin. But these physicians know, they knew at the relevant time when you pleaded, that Avastin had certain side effects, and those included proteinuria and hypertension-like events and hemorrhagic events. That's all disclosed on the label. They knew about some, but the allegation is that they didn't know about the extent or the severity of those side effects. All right, so we've gone from less than 1% for proteinuria to less than 5%. I mean, are you claiming it would have made some measurable difference? Yes, we do. The standard of care would have changed had this information been disclosed. Can I ask a question about that, though? On the form for reimbursement for these drugs, for patients who have the indicated conditions for use, does the form ask about, A, are there risks of side effects for these particular patients, and, B, if so, how severe are those risks? I would have to look at the form again to answer that question, which I can do. I have the form. Where on the record will I find the form? The form is actually appended to the government's brief. I think that's the easiest place to find it. Okay, that would be helpful. And that's CMS form 1500. And I think the key for us on that form is that it also includes a certification where the physician says the services that I'm claiming here were personally rendered by me and were medically necessary. But that's not what I'm asking, though. I'm asking whether the form specifically sought information as to whether the necessity problem, if there was one, or whether this particular patient was at an unusually high degree of risk for certain adverse effects. And I must apologize. I'll have to check into that and answer that question. Let's assume it doesn't specifically ask that. Okay? Okay. Which means that the government is not seeking that information as relevant to whether it's going to reimburse a claim that is made. It doesn't go to whether the claim would have been made in the first place. It goes to whether the information that you claim was suppressed was relevant to, material to. I don't know what the right word here is under the statute. We'd have to think down through that. But would it make a difference to the government? They're not even asking about it. I see that I'm out of time. If I could just answer this question. No, please answer that. So Genentech framed the issue in that way, the materiality issue, as to whether or not the government was concerned with the risks of the side effects here, and we framed the materiality question differently. If you look at universal health services, it says the statute or regulation that you're claiming is violated that serves as the basis for the implied false claim. And what we're saying serves as the basis for the implied false claim is the physician's certification of medical necessity. So the question for materiality purposes under universal health services is not, are the specific risk factors here material to the government, but is the physician's determination of medical necessity for this patient material to the government's payment? So the question would be, if the physician didn't sign the form, the CMS paper, and we submit no, then that's why it's material. Well, I think that goes, and again, my question would then be, and you don't have to answer this, it's sort of we may differ on whether the issue is primarily or only would the claim have been submitted in the first place because he wouldn't have made the prescription, because he wouldn't have found it medically necessary, or would the government have paid the claim if it was made and submitted? What does the government care about in deciding whether to reimburse? Right. And I would just say, well, I can go for a ball. You guys have been generous with the red line. I'm interested in the landscape of the litigation over this matter. Are there any suits for false labeling or insufficient warnings that are pending? On Avastin in particular? Yeah. That, I don't believe so. Okay. There are a few. There's a footnote in our brief that discusses cases that are similar to this about physicians being misled into prescribing drugs that have settled, that the government has settled as part of a false claims act case, and I don't remember the precise footnote. Trayvix is your closest case, right, on the facts? I would say that our closest case on the facts would be the St. Luke's Episcopal Hospital case where physicians were prescribing heart transplants when it was not necessary to do so, and the Fifth Circuit held that you could state a claim for medically unnecessary treatments under the false claims act. Before you sit down, it's unclear to me what the FDA has learned about Avastin since Mr. Petraeus' complaint has been made known to them. Can you enlighten us on that? So we allege that Genentech to this day has not disclosed any of the analyses that we made or prepared for Genentech while he was working there to the FDA, and they still have yet to disclose any of these. It's not disclosed, but I'm not sure how helpful that is. Are you saying the FDA is unaware of all this information? I mean, we can't claim that they are not aware of the allegations in this lawsuit, but are they aware of facts or evidence that proves the allegations are valid and believe they are? From your perspective, has the FDA taken any action vis-à-vis Avastin that would indicate any knowledge about the claims that you've made in this case? I think at this stage we simply don't have enough information about what the FDA knows or doesn't know to make any sort of informed statement about how they view this case in particular. It's all speculation at this point. The only thing that I would say is that from our perspective, what the FDA would or would not do is really immaterial here. It's all about the physicians. I'm wondering about the proof, you know, assuming you get to trial on this matter. You have Dr. Levin who's quite definite in his opinion. Correct. Would it require a polling or would it require information from a bulk of physicians that prescribe this medicine? I mean, some might say, you know, it wouldn't have changed my mind at all. I would have, you know, my patient had such a condition that this is the only thing that could provide any, it might provide any help and it wouldn't have made any difference to me. Is that something you would have to encounter at the time of trial? I think that in terms of the matters of proving causation or proving damages at trial, that we would have the whole tool set that's available in cases that deal with physician overbilling in general where you have to look at what did the physician know, what did the physician not know when he was prescribing or she was prescribing treatment. And that could include expert testimony about what was the standard of care, what would the standard of care have been. You can see in the in reneuron cases that was a very similar case in the RICO context. They used econometric analysis to identify the materiality and the effect that. But if the standard of care doesn't change, then it's not material and you lose. If the standard of care would not change, then it would not be material. That's correct. Right. But we would. To physician. To physician. Prescribing. Correct. Correct. We would have to prove that the standard of care would change and then that. It's not enough to find one doctor standard is how we would approach it. You found one physician who said, hey, I wouldn't have prescribed. Correct. That doesn't cut it. It would require proof of the standard of care or econometric analysis or statistical sampling is also a way that overpayments are calculated in these types of overbilling cases. I do have one more question. I'm sorry. Is it accurate to understand the type of information or the content of the information that was allegedly suppressed to be the cost of adverse reactions when they occurred? I thought that that was the heart of what you claimed, the data that was not made available when sought and mischaracterized by genetics. It's two things. It's two things. So it's that the incidence of these adverse events and negative risks were much severer than Genentech had disclosed. That means that the side effects happen more frequently and that they're more severe, particularly in patients who already have, say, proteinuria or cardiac arrhythmia. And which data set would have provided that information as opposed to the cost information? So the cost information comes into play with the January 2011 inquiry from CMS. Right. When they've, you know, there's information in the public domain about side effects potentially of adverse and do they need to set reimbursement rates. And so they seek additional information from Genentech, the material to that reimbursement setting. And, again, as we've alleged, Genentech provided CMS with false information to keep the cost the same. About the cost of the occurrences when they occurred. Correct. Okay. And the second subset that you and I were talking about? Well, it's just that they suppressed the severity and incidence of adverse effects. And when was that? And that would have been through 2009, even through 2011. The data that- But what data specifically are you claiming that they had but did not disclose? The analyses that Relator, Dr. Petratos, did on various databases that he said included more robust patient electronic medical records and the way that you could analyze the data to determine the incidence of adverse events. He performed those analyses and said, look, the incidence of these risks is much higher than we have previously reported. And this was for the kidney? Correct. Complication? Correct. Any other complication? There was a study that came out in 2010 discussing the negative side effects for kidney patients, and I've asked him in particular- And where was that study? The Wu study? Where was it done? Yeah, and that was in 2010? 2010, correct. After Dr. Petratos' studies? Correct. Okay. He was doing the analyses on the database from 2009 through 2010, correct. All right. And was the Wu study publicly available? Yes, the Wu study. Does that matter? It was a peer-reviewed journal. No, it does not matter to me for the purposes of his status as a Relator here. Does it matter to whether it was material information? Yes, because it comes from Genentech. Okay. All right. I see your point. Thank you very much. Thank you. We'll hear the other bottom, Mr. McCray. Mr. Mosier? Thank you, Your Honor. Mark Mosier on behalf of the appellees. May it please the Court. This appeal can be decided based on one well-established principle. There is no liability under the False Claims Act where the alleged fraud did not affect the government's decision to pay a claim. This Court recognized that principle in Wilkins, and the Supreme Court recently reaffirmed the point in Universal Health Services v. Escobar. All right. Before we talk about that, do you concede that the District Court wrongly conflated the decision to make a drug such as Avastin, medically acceptable with the physician's decision or conclusion that it is medically necessary? We don't concede that point, but we don't think the Court needs to reach that issue. Well, I didn't ask you to reach it. Are you going to fight your battle on that ground, or are you going to cede that? Because I'm having trouble seeing how those two concepts can be conflated. I'm going to give you a hypothetical to share my concern with you. We know that Avastin is indicated as an appropriate drug for colon cancer, right? Correct. If there's a patient in hospice whose doctor has concluded that the patient has five hours to live, it might not be a properly submitted claim for a doctor to prescribe that, right? CMS could conclude that that's not medically necessary for an expensive drug like that to be administered to someone who's got five hours left to live. Isn't that fair? Would the ground be because of the expense, or because they think as a matter of safety and efficacy it wouldn't be reasonably necessary? No doctor in his or her right mind would prescribe a drug to someone who's got five hours to live. What I would say is it's not a palliative. And assume it doesn't matter for the purpose of this question. Assume there's a difference between the two. Medically reasonable and medically unnecessary on the one hand and medically appropriate on the other. Let's assume there's a difference. What difference does it make to your analysis? It makes no difference in this case. It would make a difference in the case where CMS attempted to exercise discretion to say something that is medically accepted is unreasonable or unnecessary. But here there's no allegation that CMS would have done that. Here the record establishes that CMS thinks that on-label accepted uses of Avastin are reasonable and necessary. There's also a coverage determination specific to Avastin saying it's reasonable and necessary to prescribe Avastin for on-label or for compendium supported. So in other cases I would say every district court that's reached this decision agrees with the district court here. And the theory is once FDA determines something is safe and effective, which Congress has given explicitly to FDA to make that determination, they do it on a full record on studies. If FDA says something is medically accepted, is safe and effective, CMS is in no position to second-guess that to say we disagree and think it's unreasonable and unnecessary. But because CMS has not done that here, I don't think it's necessary to determine whether CMS has that discretion. And that's really the issue that the government is concerned about. They say in an appropriate case we want to recognize that CMS would have discretion to say something may be medically accepted, but in this particular case it was unreasonable and unnecessary. But since here there's no space between what CMS says and what FDA says, that's why I say it's unnecessary. That's right, but that's for the claims actually submitted. But I understand their argument to be their focus is not on the claims actually submitted. It's on the claims that wouldn't have been submitted but for the nondisclosure. That's correct. And they conceded in the district court, and what I didn't hear as much of today, is this recognition that even if there is an antecedent fraud on physicians, that has to cause the submission of a false claim. As the Supreme Court has repeatedly said, the False Claims Act is not a general anti-fraud statute. There may be a problem here, but it's a regulatory problem, not a litigation problem. This is what distinguishes this case from many others, and they're not really even a regulatory problem. If we go to the alleged fraud, this boils down to a disagreement with the relator and his supervisors over which databases Genentech should use to submit adverse event reports to FDA. But there's no allegation that Genentech violated any regulation by its choice of databases. There's no allegation that Genentech... Well, there's a key opinion leader who shares that concern, too. It's not just Dr. Petraeus and his employer, right? But there's no, my point though is that there's no allegation that they violated any law. You know, the typical whistleblower case, the whistleblower is exposing violations of a law, unlawful conduct. Here, there's no allegation that there was unlawful conduct. They're saying the law would be different. The regulatory scheme would be different had there been full disclosure. Isn't that their argument? No. No, they're not. I thought their argument is the standard of care would be different because the at-risk patients would be prescribed medications in lower dosages or not at all. That's sort of a separate issue. I think they're trying to say that there's some standard of care that exists apart from the compendia, the FDA. I guess the point I was trying to focus on, and going back, I guess, to the original point of, and the government agrees with this on page 32 of the brief, that not every, just because you allege an antecedent fraud of positions, that is the but-for submission of a claim, that alone isn't enough. That's where I was going to focus. What more, and why isn't it alleged in this complaint? Correct. You need to allege something about the claim that's false or fraudulent. It's a false claims act. You have to point to something about the claim itself that's false or fraudulent. It has to be material. It has to be material. First start with falsity. There's one theory of falsity that's on appeal, which is that the claim submitted for at-risk patients violated 1395Y because they were not reasonable and necessary. The district court said that's the central question in this case. That was the issue of brief and the open brief and focused on. The question is, and this goes back. This is an implied theory of falsity. The theory is that when claims were submitted for at-risk patients, there was a certification that they were eligible for payment when, in fact, they weren't because they were in violation of 1395Y. Because they violated the standard of care, they weren't reasonable and necessary. They weren't reasonable and necessary under 1395Y. But there's a concession here that they were reasonable and necessary from the standpoint of CMS. It's only the doctors that didn't think they were reasonable and necessary. So the statutory question becomes, who makes the determination of reasonable and necessary for purposes of 1395Y? The Supreme Court in Heckner v. Ringer said this is a discretionary decision for the secretary. The government's brief here says CMS makes that decision. I mean, I think the most analogous case, which we cite in our brief, is from the Second Circuit case in Bodmer. That involves a single patient. So this distinction that the relator wants to draw between broad and single. It's a single patient. The issue is whether the patient remained in the hospital for too long. It's like an overdose in a way. So, yeah, both the doctor and the hospital certified it was reasonable and necessary to keep the patient in the hospital for that length of time. The Medicare contractor denied the claim after a certain period and said those services could have been provided on an outpatient basis. It was no longer reasonable and necessary. And so the question came to the Second Circuit. Like, who makes the decision of reasonable and necessary under 1395Y? And the argument from the hospital and the doctor said, we say it's reasonable and necessary. That should be enough to get our money. And the Second Circuit said it's for the secretary and, quote, no one else to make the determination. So this idea of 1395 kind of takes into account everyone's views. It's just contrary to the case. It's contrary to the statute. You're saying physicians have no role in determining what's reasonable and necessary? I'm saying they do not make the determination under 1395Y, which is the precision they relied on. Certainly the doctors do play a gatekeeping role because you would expect the doctor not to prescribe a drug for a patient that didn't need it. And, you know, we can touch on Form 1500 because it's kind of clear. Well, especially if they did need it but was going to suffer severe adverse consequences that would put the patient in a worse position than the illness did. Right, but the question right under 1395Y, where the doctor has prescribed it, has submitted a claim for reimbursement. So really it's a straightforward syllogism. So it's after the doctor. Right. CMS has the claim, and they have to decide. They can make an independent determination. I mean, if you look at it the other way, if you gave the doctor the control and said, I think in my idiosyncratic view for some reason this is reasonable and necessary. I think you're doing something there that you did a little bit in your brief, which is you're not giving due credit to their argument. Mr. McCreary just said it's not the idiosyncratic doctor that says I wouldn't do it. He's saying it's standard of care. As I understand what you're saying, correct me if I'm wrong, it's a straightforward syllogism, that the experts at the FDA have vetted Avastin, and they've concluded that it's appropriate for use for colon cancer patients, rectal cancer patients, perhaps some others. Compendium expands that a little bit. Therefore, any time a claim is submitted for a prescription for Avastin for any one of those patients, it necessarily follows that that's a valid claim. It necessarily follows that it's reasonable and necessary under 1395Y. Since that's their only theory of falsity, that's the only relevant question for here. I think that's maybe one of the issues the government goes to, is I think it overreads how broad the decision has. I think the typical case where you see, otherwise if you have a kickback case, that's another. A violation of the anti-kickback statute can render claims fraudulent. Even when that happens, then it wouldn't be in defense to say, well, it's unlabeled, it's FDA approved. Because there the theory of falsity is relying on a violation of a different regulation. The reason why it's dispositive that all the labels are all of the prescriptions, it's dispositive here that they're all medically accepted, because this theory of falsity is that these prescriptions are unreasonable and unnecessary. But once he concedes that they are not unreasonable and they're not unnecessary from the standpoint of CMS, then the question just becomes whose opinion matters for purposes of 1395Y, CMS or the doctors? And we agree with the government, we agree with every case that has addressed that, that it's CMS that makes that determination. So is your boiling your argument down to FCA vocabulary? Is it your position that even if there could be sufficient allegations, and there were sufficient allegations that the failure to disclose these, not the existence of the side effects or the adverse reactions, but the cost of treating them compared to the cost of using other drugs, and the cost of, and the frequency of certain of the side effects, that had that been disclosed physician behavior for dose decisions and even certain patient prescription decisions would have been changed. So it would have made a difference on the number of claims submitted for certain patients or the amount of those claims if the difference was a dose. Conceding that, is it your argument that that only is half of the, that's only one of the two prongs that must be shown, the second prong would have to be that once the claim was submitted, it would have made a difference. The existence of this other information would have been important to, or material to, or had a potential to influence the decision to reimburse it. I think I might say that would be the first of at least, or probably three steps. Those allegations would be enough to say it caused the submission of a claim. Otherwise it would not have been submitted. Right. So it made it the causation that would help, but it's not enough to cause a submission of a claim, that's to cause a submission of a false claim. Right. So then we want to say, what about this claim is false? The theory that they proceeded on in the district court, which we think the court should be addressing is the theory was false because it violated 1395Y. That's the falsity thing. And then even beyond that, that falsity, the violation of the regulation, must be material to the government's payment. And so I think because of the way they framed their falsity, we think it then is enough to resolve both falsity and materiality, based on their lack of allegation that the government would have done anything differently. And here, you were asking about what happened when the government learned about this. They didn't even so much as issue a subpoena to investigate. And the reason I think is clear, and it's largely conceded, is that there are no regulations requiring Genentech to use the relator's preferred databases. So the FDA learned which databases Genentech was using and realized that's perfectly lawful. It's fine. There's no reason to have to acknowledge that. How do we know the FDA learned that? They're more opaque about that issue. Well, I mean, all of the allegations were obviously disclosed to DOJ. Obviously, it's not clear, but I think what I will say – Well, it's not obvious to me. I mean, does DOJ just – do they monitor every case that's filed? I mean, how do we know that? Because the complaints file under seal, and they have to give a statement of their facts. They have to go to – DOJ has a chance to review it, and here they decided not to. So I get the fact that they declined. Declined. Declining was after they learned about the allegations. But it is important that – I would say that Genentech has gone back to the FDA to get Avastin approved three times since these allegations came to light and there was no issue with adverse event reporting or no claims that Genentech was doing anything wrong. So FDA, even in light of this suit, FDA has continued to approve Avastin for additional reasons. Let me just ask you – Was the issue engaged before the FDA? Not that I'm aware of, because it's not – and once it's conceded here that it's not – there's no regulation being violated, right? This is sort of a claim that, in Relator's view, there are other ways that they could have done it that would have been better. You know, and I think this kind of gets to your point about, well, is it at all? Is it an issue of doctors wanting more data points? I think it would be a concern if – it's one thing to say about Relator – we want to incentivize Relators to blow the whistle on unlawful conduct. But when a company here is complying, they're so heavily regulated by the FDA, they're submitting adverse event reports in compliance with the FDA requirements to allow an employee that says, I think we should be doing more. If he can go out and find one doctor that says, boy, I would like to have that additional information, I agree with you, they should have been doing more, to say that you can plead a violation of the False Claims Act, not because they're violating reporting requirements, but because one doctor said, that would have changed my mind if I would have been giving additional information. I mean, that really would – I mean, it goes beyond being a whistleblower, right? If you're not disclosing a violation of an underlying regulation, you're just saying, I think they could have done more, and here's a doctor that agrees with me. Well, I don't want to beat a dead horse, but I do want to ask, where in the record I will find the form? As far as I'm aware, it's not in the record. It was not pled below. That's why you don't see it in the opening brief. I mean, we're looking at a case in the government's amicus brief, which is where they say, in an appropriate case, we think someone could plead a violation of the False Claims Act. But the form is not included? No, as far as I'm aware. Is that publicly available? Yes. Yeah. Is there any way to find it? It's in the brief. The form is in the brief? Yeah. I didn't find it. No, I found it. You found it? Okay. That's all right. If it's there, no worries. Sorry. Thanks. But just on that point, the thing, the reply brief, essentially concedes it's not part of the case, and at the end of the brief, asks for leave to re-plead to assert a claim to that, and with the court's indulgence, take a minute, say why we don't think the court should vacate and remand to re-plead in that theory? I have a hypothetical. I want to make sure I fully appreciate your position. Okay. Let's take the facts as we have them in terms of the labeling, but change it just a little bit. I want you to assume that had information been properly disclosed, I know you don't agree that this happened here, but I want you to assume that had Genentech properly made full disclosure, that the FDA label regarding the incidence of proteinuria would have changed from less than 1% to less than 10%. Okay. So let's assume a tenfold increase in the incidence of proteinuria. Is it your position that a doctor who prescribes Avastin for an on-label use and submits that claim to CMS and gets paid, that that is not a false claim because it was the right drug for the right treatment and the side effect risk is just an ancillary issue? So long as you still lacked any allegation, which you do here, that CMS would have done anything differently. Okay, so if that change in label, which wouldn't change the indication, but there's no allegation. Inherent in my question is that CMS would not have done anything differently, but also I think you'd concede inherent in the question is some quantum of doctors out there would take note of that tenfold increase side effect risk and there would have been fewer scripts written for patients at risk of proteinuria. Yeah, it is our position. So the government would pay out less money. Your answer is, as I understand it, is yeah, sure, the government would have paid out less money, but there still aren't any false claims because you've got the right drug for the right condition, et cetera. It's certainly, I don't think that your change in the hypothetical wouldn't change the outcome on the theory pled here. Right, and so our view is that even if there's an antecedent fraud on the doctor, in order to have liability under the False Claims Act, it has to cause something about the claim that is submitted to be false or fraudulent. There's only one theory here, which is that it's false or fraudulent because it was submitted in violation of 1395Y. When that's your only theory, that the claim necessarily fails unless you can allege that CMS would have considered that prescription to be unreasonable or unnecessary. In many instances, when a company is withholding information, they're not disclosing or they're understating the risks. They are so heavily regulated on what risks must be disclosed and the way they communicate information to doctors that the alleged violation on which a False Claims Act case is based is something else. Right, that's why you don't see a lot of these under 1395Y. You allege that they violated the promotion regulations, they violated reporting requirements to FDA, and it's the violation, right, if they should have... Reaction procedures. Yes, if they had the evidence, if they had the evidence that this had a 10% risk, but they told FDA it only had a 1% risk, they would have violated a multitude of FDA regulations and you would base your False Claims case on those regulations. Here it's just reasonable and necessary, 1395Y. That's the limited theory because they don't have allegations, that you didn't text reporting to FDA violated any of the requirements. Okay. Thank you. Anything else? Thank you, Mr. Mosher. Rebuttal? Oh, I'm sorry. Before we hear rebuttal, we'll hear from the government. Mr. Shaw. Does the government care about the dose amounts, as long as it's within the on-label limits? I'm sorry. I think the government does care. I think one of the points that we are here today to protect before this court is we wanted to make clear that the FDA's decision to approve a drug for a particular indication does not bind CMS to always reimburse for use of that drug for that particular indication. And there are myriad reasons for that. It might be the oral versus the injection. It could be my hospice. There could be many reasons why, even though it's an on-label use, it's just a bad decision for the doctor. It's unreasonable, right? Yes, I think that's exactly right. So you want to protect against this sort of broad rule that just greenlights every single on-label usage. Yes, and I think that that would have unfortunate consequences for CMS's ability to protect the public face. Yes, if the opinion made clear, if that opinion were to make clear that that is protected, that there is a recognition that in some set of circumstances the allegations could in fact plead, I think what Counsel for Genetic called the space between the two. The government, I think, is careful to take a position, to establish its position that it takes no position on whether these complaint allegations were sufficient to plead that space. Yes, I think that's exactly correct. We take no position on the merits of this particular case. Well, did the First Circuit get it right on the Narantan case? Is that the standard you want us to adopt? I'm sorry, in what respect? In where you say liability may attach where the connection between the fraud and the claim is sufficiently close. That's a pretty vague thing to say. Yes, I mean, I think... So will defendant's fraud, did it intend to induce physicians to prescribe the drug and it was reasonably foreseeable that the federal government would pay for the treatment? Right, I think that is a standard aspect of the causation inquiry that's common to many False Claims Act cases, and that is in fact the element that this Court addressed in United States' X. R. L. Schmidt v. Zimmer. And the question in that case was whether the defendant's fraudulent scheme was a cause of the subsequent payments that were submitted to Medicare. So I think the same kind of analysis that this Court used in Zimmer would also apply to this kind of claim. So I just want to address a few issues that were raised in the preceding argument. I think as to the concern that any sort of information that some relator could come up with would suffice to make out a claim, any information that some doctor might want to know would suffice to make out a claim under this theory. I don't think that's correct. The essence of this theory is that there has been a fraudulent misrepresentation with the requisite scienter that actually caused... I'm sorry, the fraud on the physician theory, which is the third argument in our brief. The essence of this theory is that the fraudulent misrepresentation actually caused the physician to prescribe drugs in a situation where they would not have. And furthermore, that this claim, which would not have existed otherwise, is a cause of the subsequent claim for payment against Medicare. And that would be... A cause for it being submitted. Yes, yes. And obviously there's also a materiality element here, and we think the way that applies is that the fact of a fraud on the physician must be material to CMS's reimbursement decision. And we know that CMS will not reimburse for claims and cases in which it knows that the doctor determines that a treatment is not medically necessary. And we actually have an example of this. But their claim is the inverse of that. They're saying the doctor doesn't know because the doctor's not given the information. Right, that's right. So then here, based on what the doctors do know, how could there be a false claim when a doc prescribes Avast into a cancer patient? Right, so I take it, I mean, I'm not sure if I'm understanding your question, but if the point is that if a doctor acts in full awareness or if the doctor did not actually rely on the fraudulent misrepresentation, then we agree that there would be no claim. The doctor needs to have actually relied on the fraud, therefore causing the submission of a claim that would not otherwise exist. But speaking to the material. Even if CMS or the FDA would not have changed the way it described the on-label uses, including doses that were within label limits. Right, and I think you're speaking to. And would not have changed the description of the risks in the compendium. Yeah, I don't, based on a related representation during argument, I don't believe that they are alleging a fraud on the FDA or a fraud on the compendium theory. So I don't think the court needs to address that question. I'm not sure that we can avoid addressing that question in order to address your, was this fraud under the statute. I don't think it's an essential element of the fraud on the physician theory that there also be a fraud on the FDA or the compendium. But there has to be a decision, an influence on the decision to reimburse. Right, and the reason that there is a natural tendency to influence the decision to reimburse is that CMS will not reimburse for a claim in a case where it knows that the doctor determines that the treatment is medically necessary or would have so determined absent some fraud. And I can. I just want to ask one question. Sure. Is it right to understand what you're arguing, that in any case in which there is a fraud on the physician theory that results in claims being submitted that would not have otherwise been submitted or for doses that would not have otherwise been submitted, that that is enough for establishing an effect on or a potential to influence the decision to reimburse because there would never be a decision to reimburse for a claim that otherwise would not have been made? I think that's correct. So they're always the same. They do collapse. I mean, I think as a practical matter we know that because in cases where doctors have not determined that a treatment is medically necessary, then CMS does not reimburse. So that happens sometimes, for example. And the form doesn't get submitted because that's part of the certification on the form and the only thing that's quoted out of 1500. Right. So if, for example, a drug is prescribed for a cosmetic purpose, which is not medically necessary, physicians sometimes submit the form, but then they actually leave out that specific certification. And when CMS sees a form like that, it determines that the drug is not reasonable and necessary and it does not reimburse for that claim, even though the doctor prescribed it, I see that my time is up, but we ask that the court simply recognize or at least not contradict the three propositions that we state in our brief. Thank you very much. Thank you, Mr. Shaw. Roberto, Mr. McCleary? So there are a couple of points that Jimentech raised that I would like to address, the first being the theory of falsity. And basically Jimentech's position is that whether or not Jimentech did anything wrong or they're not commenting on that, but that at best they cause a submission of true claims because CMS and the FDA determine what is medically reasonable and necessary. And our theory of falsity is that the doctor's determination of medical necessity is material to the government's decision to pay. And so Jimentech presents 1395YA1A as a binary choice. Either CMS determines what's reasonable and necessary or the doctors determine what's reasonable and necessary. And we say it's not a binary choice, that it's a symbiotic relationship between CMS and the physicians. Of course, CMS has the ultimate say. If a doctor says, I think 10 milliliters of Avastin a day is reasonable and necessary, and CMS does an individual audit and reviews it and says, you know what, in this case we don't think that's reasonable and necessary, then that's what's going to control. But the physician's determination of medical necessity is material to the government because CMS does not have the resources to determine for everyone who is a recipient of federal health insurance benefits that treatments are individually reasonable and necessary. They rely on doctors for that. And the statutory and regulatory scheme is set up to emphasize the role of the physician as a gatekeeper. You have the Assurance Clause under 42 U.S.C. 1320C-58. It says, Congress says, it's the obligation of every health care provider to assure that the treatments that they provide are, quote, provided economically and only when and to the extent medically necessary. So our theory of falsity is that by suppressing material information from the doctors, it affected their prescribing habits. This is the standard of care we refer to. It's material to the doctors, correct, such that they cause the physicians to certify that treatment of Avastin at this dose was medically necessary. Absent the fraud, they would not have made that certification. That's how the certification is false. It doesn't matter if CMS says generally these types of treatments at this dose is acceptable. But isn't it possible that that's material to the doctor but not material to CMS? And you hit upon this with the government. The but-for materiality question here is would CMS have reimbursed had the doctor said, I'm submitting a claim for 10 milligrams of Avastin per day for this patient, but I only think five is medically reasonable and necessary. No, CMS would not have. But that's not what the claim says. I mean, how could we conclude anything other than the fact that CMS would approve a prescription for an unlabeled use? But they had an unlabeled dose. Right. The only reason they approved is a result of the fraud, because had the physician not certified medical necessity, then CMS would not have paid. So that's where the falsity comes, because this is an omission case. But that analysis obtains any time you do find your idiosyncratic doctor who would have prescribed a lower dosage. It's got to depend on what the FDA does or what CMS does. It's up to the vagaries of the prescribing physician. Not entirely, because it's a dual role of both CMS and the physician. So if the physician said, well, I think treating 100 million milligrams of Avastin is reasonable and necessary, that would still not fly with CMS, because they have the check to say, no, this is not reasonable and necessary. We've set guidelines. But that's not an unlabeled dosage, right? That's what you just gave up. That's correct. The physician doesn't become the final arbiter of what's reasonable and necessary, but the physician's determination of medical necessity is material to payment. So even if you do have the one-off doctor who says, well, you know, maybe 10 milligrams of Avastin is necessary, and I only think 5 milligrams is really reasonable and necessary, but I'm going to bilk Medicare because CMS says I can get away with 10 milligrams, that's still a fraud. That's still causing reimbursement from the government that the government should not have paid based on the physician's own certification of medical necessity. Is medically necessary the identical to medically reasonable and necessary? I think so, yes. So if you look at the Assurance Clause, the Assurance Clause uses medical necessity, and then the 1395YA1A says medically reasonable and necessary. So they're identical. Correct. And what's the difference between those two and medically appropriate? Do you mean which we reference in our factually false theory of liability? It's very similar. There's different words. Correct. We use the term medically appropriate just to distinguish it for purposes of briefing to make it less confusing. The factually false theory of liability is that these treatments were not medically necessary as a fact. They were not reasonable. They were not reasonable, but the physician represented to the government in his claim for reimbursement by signing a certification that they were reasonable and necessary services, and that under Wilkins is a factually false claim because they misdescribed. Where is appropriate used in the statute or regulation? Appropriate is just a term that we use in our briefing. It's not in the statute. The factually false claim is distinct from a legally false claim. So the legally false theory requires that a statute was violated that's material to the government's decision to pay. The factually false claim is separate. It doesn't rest on any part of the statutes or the regulations. It's just a matter of were the claim for services are good, were they misdescribed by the claimant? And we're saying that they were misdescribed because when the physician submits the treatment for Avastin, the physician is certified, this isn't medically necessary for this patient, when, in fact, it was not. So the fact of the lack of medical necessity is different from who has the legal duty to determine medical necessity under the statutory scheme. We're saying that there are two things. They're very related. They're both based on Avastin being medically unnecessary for these at-risk patient groups at the dosages prescribed. But they're just based on, one, the statutory scheme, or, two, the actual fact of the lack of medical necessity. And are you saying that 1395Y covers both? No, 1395YA1A applies only to the legally false claims. Legally, okay. Thank you. Thank you. The case was very well briefed and argued. We'll take the matter under advisement. I'll ask Mr. Williams to recess court very briefly before we get ready for the next argument. And will the parties share in the cost of providing a transcript to the court, please? Thank you. Thank you. Thank you.